Petition of the BOROUGH
OF DOWNINGTOWN

Appeal of: Borough of Downingtown, Council of the Borough of Downingtown, Progressive Housing Ventures, LLC and J. Loew & Associates, Inc.

Petition of the Borough
of Downingtown

Appeal of: Kim Manufacturing
Company and Stewart
Hall, L.P.

Petition of the Borough
of Downingtown

Appeal of: Friends of Kardon
Park and Ann Feldman.

Commonwealth Court of Pennsylvania.

Argued Sept. 10, 2014.
Decided April 29, 2015.

Robert L. Byer, Philadelphia, and Patrick M. McKenna, West Chester, for designated appellants.

Henry F. McHugh, Media, for appellees Kim Manufacturing Company and Stewart Hall, L.P.

Samuel C. Stretton, West Chester, for appellees Friends of Kardon Park, Marion Ungrich, Ann M. Feldman and Evelyn Hopkins.

Claudia M. Tesoro, Senior Deputy Attorney General, Philadelphia, for appellee Office of Attorney General.

BEFORE: DAN PELLEGRINI, President Judge, and BERNARD L. McGINLEY, Judge, and RENÉE COHN JUBELIRER, Judge, and ROBERT SIMPSON, Judge, and P. KEVIN BROBSON, Judge, and PATRICIA A. McCULLOUGH, Judge, and ANNE E. COVEY, Judge.

## OPINION

PER CURIAM.

These matters involve the cross-appeals of the Borough of Downingtown and the Council of the Borough of Downingtown (together, the Borough), Progressive Housing Ventures, LLC and J. Loew & Associates, Inc. (together, Developers), Kim Manufacturing Company, Stewart Hall, L.P., Friends of Kardon Park, and Ann Feldman (together, Objectors) from the December 20, 2013 order of the Court of Common Pleas of Chester County, Orphans' Court Division (trial court) denying the Borough's request to convey two parcels of property, UPI Nos. 11–4–14 and 11–4–14.2 (hereafter referred to as the Southern Parcels); finding that no approval was required for the Borough to convey another two parcels, UPI Nos. 11–4–13 and 40–1–23.1 (hereafter referred to as the Northern Parcels); and finding that no approval was required for the Borough to grant Developers the proposed easements relating to parcels UPI No. 11–4–23 (here-

after referred to as the Meisel Parcel) and a portion of UPI No. 40–1–23.1, one of the Northern Parcels.

## FACTS/PROCEDURAL HISTORY

These matters were before the trial court as a result of separate orders of this Court vacating and remanding previous orders of the trial court denying the Borough's petition for approval of sale of real property (2012 remand decision) and holding that no Orphans' Court approval was required for the Borough's grant of certain easements to Developers (2013 remand decision).[1]

In the 2012 case, the Borough filed a petition with the trial court seeking Orphans' Court approval to sell several parcels of land commonly referred to as Kardon Park to Developers. The parcels are located partly in the Borough and partly in East Caln Township (Township). In the 2013 case, the Borough and Developers sought a declaration from the trial court that no Orphans' Court approval was required for the Borough to grant certain easements to Developers over the Meisel Parcel and a portion of one of the Northern Parcels in conjunction with the development of a neighboring parcel which the Borough had also agreed to sell to Developers. Without these easements, Developers will be unable to develop the neighboring parcel in compliance with the open space and stormwater management requirements of the Township's zoning ordinance.

The Meisel Parcel was acquired by the Borough by purchase from Kathryn Meisel in 1962. This parcel includes two man-made ponds known as Second and Third

---

1. The 2012 case was an *en banc* opinion reported at *Borough of Downingtown v. Friends of Kardon Park*, 55 A.3d 163 (Pa.Cmwlth. 2012). The 2013 case, *In re Council of the*

*Borough of Downingtown*, 2013 WL 3156607 (Pa.Cmwlth., No. 2205 C.D.2011, filed June 18, 2013), was an unreported panel opinion.

Lakes. Pursuant to an agreement with the Borough, Developers sought to maintain this parcel as parkland. However, this is one of the parcels over which the Borough proposed to grant Developers certain easements. As we noted in our 2012 opinion, pursuant to an agreement between the Borough and Developers, Developers would be granted "[s]uch free, uninterrupted perpetual and/or temporary (as applicable) easements over, under and through this parcel as required to: (1) construct improvements or perform work on the parkland as required by any approved conditional use or subdivision or land development plans, or other governmental approvals; (2) construct or extend utilities to serving the development on the adjacent parcels; (3) discharge storm water from the adjacent developed parcels into the ponds; and (4) maintain improvements necessary for the maintenance of common amenities on the neighboring developed parcels." *Borough of Downingtown v. Friends of Kardon Park*, 55 A.3d at 176.

The Northern Parcels were acquired by the Borough in 1968 with Project 70 funds for recreation, conservation, and historical purposes.[2] These parcels were released from the Project 70 deed restrictions by the General Assembly in June 1999 and in October 2012.[3] Both parcels would be developed under the proposed plan, although a portion of one of these parcels would be retained by the Borough as parkland. It is this portion over which the Borough proposed to grant Developers temporary construction, maintenance, and utility easements as well as a permanent easement to discharge stormwater into an existing man-made pond on the property known as Fourth Lake.

The Southern Parcels were acquired by condemnation in 1974 and 1977, respectively, for park and recreation purposes. Both parcels would be developed under the proposed plan.

In the 2012 case, upon learning of the development agreement between the Borough and Developers, Objectors filed suit with the trial court seeking to enjoin the sale. Objectors alleged that the proposed sale violated the common law public trust doctrine[4] and the Donated or Dedi-

---

2. Project 70 refers to the Project 70 Land Acquisition and Borrowing Act (Project 70 Act), Act of June 22, 1964, Special Sess., P.L. 131, *as amended*, 72 P.S. §§ 3946.1–3946.22. Section 2(4) of the Project 70 Act authorized the Commonwealth to incur debt to assist political subdivisions with the acquisition of land for recreation, conservation, and historical purposes. 72 P.S. § 3946.2(4). Section 20(b) of the Project 70 Act also restricted the political subdivisions from disposing of or using these lands for any other purposes without the approval of the General Assembly. 72 P.S. § 3946.20(b).

3. The 1999 release provides, in pertinent part, that "the General Assembly hereby authorizes the release of Project 70 restrictions from the lands described in section 2," i.e., UPI No. 11-4-13. (R.R. at 1159a.) The 2012 release states that "the General Assembly hereby approves the release of Project 70 restrictions from the land owned by the Borough of Downingtown ...," i.e., UPI No. 401–23.1. (R.R. at 2982a.) This release goes on to state that "[t]he proceeds of the sale of the land and the release of the Project 70 restrictions shall be deposited into an interest-bearing account established by the Borough of Downingtown and designated solely for the purposes of the conditions under this subsection," with the conditions including "improvements to Kardon Park in accordance with a development plan," and the Borough retaining and maintaining at least twenty acres of public parkland. *Id.*

4. "Under the common law public trust doctrine, when land has been dedicated and accepted for public use, a political subdivision is estopped from interfering with or revoking the grant at least so long as the land continues to be used, in good faith, for the purpose for which it was originally dedicated." *In re*

cated Property Act (DDPA).[5] In response, the Borough filed its petition for approval of the sale with the trial court. The trial court consolidated these actions and held multiple hearings.[6] By opinion and order dated October 7, 2010, the trial court denied the Borough's petition. The trial court concluded that Kardon Park had been dedicated and accepted for public use, and had been maintained by the Borough for decades. The trial court also concluded that the DDPA, which incorporated the salient common-law principles of the public trust doctrine, applied and that the Borough failed to meet its burden under the DDPA to establish that the parkland use of the property was no longer practicable or possible.[7,8]

On appeal, this Court, sitting *en banc,* vacated and remanded the trial court's decision. With respect to the Northern Parcels acquired with Project 70 Act funds, we remanded to the trial court for consideration of any possible interaction between the Project 70 Act and the DDPA. However, we did note that the General Assembly's release of UPI No. 11–4–13 permitted its conveyance and that only the Commonwealth, and not private citizens, can initiate proceedings to enforce Project 70 Act restrictions. With respect to the Southern Parcels acquired via condemnation, we remanded for the trial court to make further factual findings regarding how long the Borough held the parcels following their condemnation and to consider the application of section 310(a) of the Eminent Domain Code (Code), 26 Pa.C.S. § 310(a) (relating to disposition of property after abandonment of the purpose for which the property was condemned), in conjunction with the DDPA. With respect to the Meisel parcel and parcel UPI No. 40–1–23.1, we remanded for the trial court to determine whether the construction, maintenance, and utility easements, as well as the easement relating to the discharge of stormwater into two lakes, are inconsistent with the use of the parcels as parkland.

Regarding the 2013 case, the Township's Board of Supervisors had granted Developers conditional use approval for their development, including the aforementioned easements and the use of these easements to satisfy the stormwater management and open space requirements of the Township's zoning ordinance. Objector Feldman appealed to the trial court, which affirmed the Board's order. On further appeal, this Court reversed, concluding that, since the Borough used Project 70 Act funds to purchase UPI No. 40–1–23.1, the Borough must first obtain approval from the General Assembly to convey an encumbrance to Developers in accordance with section

---

*Estate of Ryerss,* 987 A.2d 1231, 1237 n. 8 (Pa.Cmwlth.2009) (citation omitted).

5. Act of December 15, 1959, P.L. 1772, *as amended,* 53 P.S. §§ 3381–3386.

6. The Commonwealth of Pennsylvania, Office of Attorney General (the Commonwealth) entered an appearance as *parens patriae* but took no position regarding the Borough's petition. Counsel for the Commonwealth did briefly question several witnesses on cross-examination over the course of these hearings.

7. Section 4 of the DDPA provides that the municipality may seek the approval of the Orphans' Court to sell a "particular property held in trust as a public facility" when the "continuation of the original use ... is no longer practicable or possible or has ceased to serve the public interest...." 53 P.S. § 3384.

8. The trial court rejected the Borough's argument that past use of certain parts of Kardon Park as a landfill resulted in contamination at the site, which the Borough could not afford to remediate and which rendered the parkland use of the property no longer practicable or possible.

20(b) of the Project 70 Act, 72 P.S. § 3946.20(b).[9]

While these appeals were pending, however, the Borough and Developers filed their petition with the trial court seeking a declaration that the Borough was not required to obtain Orphans' Court approval for the grant of the construction and stormwater easements. Objectors Feldman and Friends of Kardon Park intervened in the action. The trial court ultimately issued an order granting the joint petition filed by the Borough and Developers, concluding that Orphans' Court approval was not required and that the DDPA was not implicated. The trial court explained that the property equitably owned by Developers had not been donated or dedicated for public use and that the Orphans' Court's jurisdiction only extends to a municipality's decision to sell or discontinue use of such property. More importantly, the trial court held that the Borough's grant of the requested easements did not constitute a sale or a change in use of the property.

On appeal, a panel of this Court vacated and remanded the trial court's decision. We noted that while the property equitably owned by Developers had not been donated or dedicated for the public use, the parcels subject to the easements were part of the dedicated and publicly-used Kardon Park. We further noted that, at the very least, the proposed easements with respect to these parcels will alter the use, or constitute an alienation of, portions of Kardon Park, thereby implicating the DDPA and necessitating Orphans' Court approval. Thus, we remanded for the trial court to make further findings and conclusions with respect to the application of the DDPA.

The trial court consolidated the cases on remand, held further hearings, and issued an order dated December 20, 2013, denying the Borough's request to convey the Southern Parcels acquired by condemnation, holding that no Orphans' Court approval was required for the Borough to convey the Northern Parcels acquired with Project 70 Act funds, and holding that no Orphans' Court approval was required for the Borough to grant the proposed easements.

In an accompanying opinion, the trial court reiterated its previous holding that the DDPA applied to the Southern Parcels since both parcels constitute "fully-realized dedications" for "parkland purposes," (Trial court op. at 5, 7), that the Borough failed to meet its burden under section 4 of the DDPA, 53 P.S. § 3384, to show that "the continuation of the original use ... is no longer practicable or possible or has ceased to serve the public interest," and that no section of the Code exempts these parcels from the applicability of the DDPA. The trial court rejected an argument from the Borough that section 6 of the DDPA, 53 P.S. § 3386, exempted these parcels. Section 6 of the DDPA states that "[n]othing in this act shall be construed to limit or affect the control by a political subdivision of public lands or buildings acquired by such political subdivision by purchase or condemnation." Despite this language, the trial court cited the following discussion from our Supreme Court in *In re Erie Golf Course*, 605 Pa. 484, 992 A.2d 75 (2010):

> As to Section 6, we have observed that the statute is ambiguous and potentially paradoxical. Further, we differ with the notion (which is at least implicit in the Commonwealth Court dissent) that a bright line separates dedications and

**9.** *Feldman v. Board of Supervisors of East Caln Township*, 48 A.3d 543 (Pa.Cmwlth. 2012), *appeal denied*, 620 Pa. 591, 71 A.3d 245 (2013).

purchases, since, under the governing principles, purchased property can be committed to the public trust. Given the overlap, we find it most reasonable to construe Section 6 as redressing a concern for the preservation of such rights and interests as a political subdivision may have acquired in connection with a purchase. We do not believe, however, that the provision was intended to remove entirely from the Act's purview (and thus maintain inflexible irrevocability relative to) any and all trust property that may in any sense of the word be said to have been purchased. *Id.* at 88 (citations omitted). The trial court noted that the court in *Erie Golf Course* refused to read section 6 as eliminating purchased property from the scope of the DDPA and surmised that the Court's reasoning applies equally to property acquired by condemnation.[10]

Regarding the Northern Parcels, the trial court concluded that the 1999 and 2012 releases from the General Assembly allowed the Borough to convey these parcels without Orphans' Court approval.[11] The trial court cited language from our previous decision wherein we stated that such a release permits the conveyance. Additionally, the trial court concluded that Objectors lacked standing to contest the conveyance of these parcels under the Project 70 Act because only the Commonwealth, and not private citizens, has the authority to enforce the restrictions under that Act.

 Regarding the Meisel parcel, the trial court found that the proposed easements were not inconsistent with the use of this parcel as parkland and, therefore, the DDPA was not implicated and no Orphans' Court approval was required with respect to the grant of these easements. The trial court cited testimony from the 2013 hearings which established that the Second and Third Lakes on this parcel already receive stormwater runoff from the areas of Kardon Park which would be developed and that the runoff would not affect the current recreational uses of these lakes.[12] Based on this testimony, the trial court found that the Borough would continue to use the lakes to accept stormwater runoff and the public will continue to use both parcels as parkland. The Borough, along with Developers, and Objectors filed cross-appeals of the trial court's order.[13]

---

**10.** Alternatively, should this Court conclude that section 301(a) of the Code was applicable, the trial court found that the Borough has owned the Southern Parcels for more than 21 years, that the Borough abandoned the purpose of parkland use of the parcels (citing the rezoning of Kardon Park from park use to commercial use as early as 1999 and the agreements of sale with the Developers), and that Objectors lacked standing to contest the conveyance under the Code. The trial court further rejected an argument from Objectors Feldman and Friends of Kardon Park that they have standing under the theory of "private attorney general." In this regard, the trial court noted that counsel for the Office of Attorney General was present during all of the hearings and conferences and submitted briefs and the fact that it chose not to present evidence does not mean the Commonwealth abdicated its role as *parens patriae*.

**11.** While not specifically stated, the trial court appears to have concluded that the 2012 release of UPI No. 40–1–23.1 also permitted the grant of the proposed easements without Orphans' Court approval. However, the 2012 release made no mention of these easements.

**12.** At these hearings, the Borough and Developers presented the testimony of Dennis Glackin, a licensed professional land planner, and Victor Kelly, a licensed professional engineer. Both Glackin and Kelly testified that that the proposed easements will not alter the current use of the property as parkland or the current recreational uses of the lakes on the property.

**13.** On appeal from an order of an orphans' court, this Court's scope of review is limited to determining whether the record is free from legal error and whether the orphans'

## The Borough/Developers' Appeal

## The Southern Parcels

■ In their appeal, the Borough and Developers argue that the trial court erred as a matter of law in concluding that the DDPA, rather than section 310(a) of the Code, controls the Borough's disposition of the Southern Parcels which were acquired by condemnation. We disagree.

We begin with a review of the relevant statutory provisions. Section 310(a) of the Code provides as follows:

If a condemnor has condemned a fee and then *abandons the purpose for which the property has been condemned,* the condemnor may dispose of it by sale, lease, gift, devise or other transfer with the following restrictions:

(1) If the property is undeveloped or has not been substantially improved, it may not be disposed of within ten years after condemnation without first being offered to the condemnee at the same price paid to the condemnee by the condemnor.

(2) If the property is located outside the corporate boundaries of a county of the first or second class and is undeveloped or has not been substantially improved and was devoted to agricultural use at the time of the condemnation, it may not be disposed of within 21 years after condemnation without first being offered to the condemnee at the same price paid to the condemnee by the condemnor.

(3) If the property is undeveloped or has not been substantially improved and the offers required to be made under paragraphs (1) and (2) have not

been accepted, the property shall not be disposed of by any condemnor, acquiring agency or subsequent purchaser for a nonpublic use or purpose within 21 years after condemnation. Upon petition by the condemnor, the court may permit disposal of the property in less than 21 years upon proof by a preponderance of the evidence that a change in circumstances has abrogated the original public purpose for which the property was taken.

26 Pa.C.S. § 310(a) (emphasis added).

Section 2 of the DDPA states as follows:

All lands or buildings heretofore or hereafter donated to a political subdivision for use as a public facility, or *dedicated to the public use* or offered for dedication to such use, where no formal record appears as to acceptance by the political division, as a public facility and situate within the bounds of a political subdivision, regardless of whether such dedication occurred before or after the creation or incorporation of the political subdivision, shall be deemed to be held by such political subdivision, as trustee, for the benefit of the public with full legal title in the said trustee.

53 P.S. § 3382 (emphasis added). Section 3 of the DDPA provides that "[a]ll such lands and buildings held by a political subdivision, as trustee, shall be used for the purpose or purposes for which they were originally dedicated or donated, except insofar as modified by court order pursuant to this act." 53 P.S. § 3383.

Section 4 of the DDPA provides that:

When, in the opinion of the political subdivision which is the trustee, **the**

---

court's factual findings are supported by the evidence. *In re Estate of Ryerss,* 987 A.2d 1231 (Pa.Cmwlth.2009). As the trier of fact, the trial court resolves conflicts in the evidence presented and its findings, if supported

by competent record evidence, are entitled to the weight of a jury's verdict. *In re Estate of Schram,* 696 A.2d 1206 (Pa.Cmwlth.), *appeal denied,* 550 Pa. 712, 705 A.2d 1313 (1997).

**continuation of the original use of the particular property held in trust as a public facility is no longer practicable or possible and has ceased to serve the public interest,** or where the political subdivision, as trustee for the benefit of the public, is in doubt as to the effectiveness or the validity of an apparent dedication because of the lack of a record of the acceptance of the dedicated land or buildings, the trustee may apply to the orphans' court of the county in which it is located for appropriate relief. The court may permit the trustee to—

(1) Substitute other lands or property of at least equal size and value held or to be acquired by the political subdivision in exchange for the trust property in order to carry out the trust purposes.

(2) If other property is not available, sell the property and apply the proceeds to carry out the trust purposes.

(3) In the event the original trust purpose is no longer practicable or possible or in the public interest, apply the property or the proceeds therefrom in the case of a sale to a different public purpose.

(4) Relinquish, waive or otherwise quitclaim all right and title of the public in and to such land and buildings as have been apparently dedicated but for which no formal acceptance appears of record: Provided, only, That the court is satisfied upon hearing the evidence that there is no acceptance by implication arising out of public use or otherwise, the court shall also determine the consideration, if any, to be paid to the political subdivision.

53 P.S. § 3384 (emphasis added). Section 4(4) requires that all terms in the first paragraph be met, specifically that continuation of the original use of the property is no longer practicable or possible and has ceased to serve the public interest. There

was no showing here that the continued use was no longer practicable or possible or that Kardon Park ceased to serve the public interest. This is required by the clear statutory language.

In order to consider disposing of the property, the requirements of section 4 must be met even before referring to section 6 of the DDPA. The Borough does not reach application of section 6 otherwise. While section 6 states that "[n]othing in this act shall be construed to limit or affect the control by a political subdivision of public lands or buildings acquired by such political subdivision by purchase or condemnation," 53 P.S. § 3386, the Borough did not first meet the requirements of section 4 of the DDPA. Nevertheless, as noted above, our Supreme Court in *Erie Golf Course* refused to read section 6 as eliminating purchased property from the scope of the DDPA.

We believe that the trial court properly extended the reasoning of *Erie Golf Course* to property acquired by condemnation. In *Erie Golf Course,* lands known as the Erie Golf Course were conveyed to the City of Erie by a private developer in 1926 for nominal consideration of $1.00 and assumption of a $15,000.00 mortgage. The deed included a restrictive covenant, consistent with an authorizing ordinance, memorializing the City's commitment to preserve the property, indefinitely, as a golf course and/or for park purposes. The City acted consistent with this covenant until 2006, at which time it permanently closed the golf course and authorized advertisements for the sale of the property.

The City filed a petition seeking relief under the DDPA, alleging that the original purposes were no longer practical and that the property had ceased to serve the public interest. The trial court permitted the Lake Region Conservancy and the Committee to Keep Erie Golf Course Open to

intervene. The trial court ultimately denied the relief sought by the City, concluding that the property must remain in the public trust. The trial court also concluded that the public trust doctrine, not the DDPA, controlled the resolution of the matter. ·On appeal, this Court reversed, concluding that the DDPA applied to all properties dedicated for public use, including the golf course. We remanded to the trial court for consideration of the City's petition under the DDPA, noting the substantial judicial deference gleaned from the DDPA to a political subdivision's decision to dispose of dedicated property.

On further appeal, the Supreme Court vacated our decision and remanded for further proceedings. The court held that the DDPA applied to fully-realized dedications as well as dedications where there may be uncertainty as to acceptance, noting that the DDPA incorporated "salient common-law principles" and that, "to the extent that the [DDPA] modifies the public trust doctrine, the prior common-law principles are. superseded." *Erie Golf Course*, 992 A.2d at 86. However, the court disagreed with this Court's view that section 4 of the DDPA vested controlling discretion with the political subdivision, concluding that section 4 "does not vest controlling discretion in the political subdivision; rather, it merely specifies under what circumstances the municipality, as trustee, may file an application in an orphans' court." *Id.* at 87. The court held that "[t]he controlling discretion is squarely reposited in the [orphans'] court," to which appellate court deference is due. *Id.* The court noted that "[w]hile substantial deference may be due generally to discretionary administrative and legislative acts, presently, the sale of the property was not discretionary with the City in the first instance in light of its fiduciary obligations and recorded covenant." *Id.*

Regarding the DDPA, the Supreme Court identified section 6 as "ambiguous and potentially paradoxical," *id.* at 88, noting that preexisting law, namely the public trust doctrine, was more restrictive than the DDPA with respect to the alienability of purchased property dedicated to public use. The court described section 6 as "redressing a concern for the preservation of such rights and interests as a political subdivision may have acquired in connection with a purchase." *Id.* However, the court did not believe "that the provision was intended to remove entirely from the Act's purview (and thus maintain inflexible irrevocability relative to) any and all trust property that may in any sense of the word be said to have been purchased." *Id.*

In other words, the court in *Erie Golf Course* declined to read section 6 as eliminating purchased property from the scope of the DDPA. In the case *sub judice*, it would be illogical to conclude that the same reasoning would not apply to property acquired by condemnation. Moreover, the court in *Erie Golf Course* specifically held that the DDPA applied to "fully-realized dedications, as well as to ones where there may be uncertainty as to the acceptance." *Id.* at 89. A property is considered dedicated "upon a municipality's commitment of the property to public use and acceptance by the public." *Id.* at 86.

The record establishes that the Borough has committed the Southern Parcels to public use and the public has accepted this use. For example, the declaration of taking for each of the Southern Parcels reveals that the purpose of the Borough's condemnation was to "expand and enlarge recreation places and space within the borough limits." (R.R. at 1146a, 1153a.) Additionally, the Southern Parcels were part of a formal dedication ceremony on October 1, 1978, which included the Borough's mayor, the Borough manager, and mem-

bers of Borough Council, as well as the erection of sign reading "Kardon Park" along Pennsylvania Avenue, which borders these particular parcels. (R.R. at 2369a–70a.) Furthermore, the Borough has maintained Kardon Park for decades and has upgraded the Southern Parcels with a parking area, a paved trail known as the "Lions Trail," and a Crime Victims Memorial. (R.R. at 44a.) Moreover, the Borough and Developers do not dispute that the public presently continues to use Kardon Park.

With respect to section 310(a) of the Code, the very terms of that section reflect that it only allows the disposition of condemned property by "sale, lease, gift, devise or other transfer" where a condemnor "abandons the purpose for which the property has been condemned." 26 Pa.C.S. § 310(a). In this case, the condemnor, the Borough, stated that the purpose of the condemnation was to "expand and enlarge recreation places and space within the borough limits." (R.R. at 1146a, 1153a.) As noted above, the Borough achieved that purpose and Kardon Park continues to satisfy that purpose in the present day. In this regard, we note our agreement with Objectors' interpretation of section 310(a) as applying only to the sale of con-

demned land for which the public purpose has been abandoned and, hence, a dedication has not been realized. Since the Southern Parcels continue to be used as public parkland, their purpose has not been abandoned and the trial court properly held that the DDPA, rather than section 310(a) of the Code, applied to the Borough's conveyance of the Southern Parcels.[14] Because the DDPA applies, the Borough cannot convey these parcels without Orphans' Court approval.

### Objectors' Appeal

### The Northern Parcels

■ Objectors first argue that the trial court erred as a matter of law in concluding that the DDPA did not apply to the Borough's disposition of the Northern Parcels in light of the General Assembly's releases of these parcels from the Project 70 Act restrictions. We disagree.

Article 8, section 15 of the Pennsylvania Constitution authorized the Commonwealth "to create debt and to issue bonds ... for participation by the Commonwealth with political subdivisions for the acquisition of land for parks, reservoirs and other conservation and recreation and historical preservation purposes." [15] As

---

14. Based upon this determination, we need not address the trial court's alternative findings regarding Objectors' standing under the Code or the private attorney general's doctrine. Indeed, section 5 of the DDPA provides that:

In all proceedings under this act, the political subdivision shall give at least ten days' notice of the filing of its petition to the Attorney General who may become a party thereto and shall give notice to the public of the proposed date of the hearing, by publication, once a week for three successive weeks in the official legal journal of the county and in a newspaper of general circulation in the municipality, if there be one, or, if not, in a newspaper of general circulation in the county. *Any resident of the*

*political subdivision or any group or organization of residents of the political subdivision shall have the right to file a protest and, in the discretion of the court, shall be entitled to be heard in person or by counsel or to intervene in such action and to be a party thereto.*

53 P.S. § 3385 (emphasis added).

15. Article 8, section 15 of the Pennsylvania Constitution is entitled "Project '70'" and states, in pertinent part:

[T]he Commonwealth may be authorized by law to create debt and to issue bonds in the amount of seventy million dollars ($70,000,-000) ... for participation by the Commonwealth with political subdivisions in the acquisition of land for parks, reservoirs and

noted above, the General Assembly thereafter enacted the Project 70 Act to assist local governments with acquiring land for "recreation, conservation and historical purposes." Section 2(4) of the Project 70 Act, 72 P.S. § 3946.2(4).[16] The General Assembly further proscribed the use of such land for any other purpose *without its express approval* and required the inclusion of a restrictive clause in all deeds for such land. Sections 20(b) and (c) of the Project 70 Act, 72 P.S. § 3946.20(b), (c).[17] In other words, the Project 70 Act

other conservation and recreation and historical preservation purposes, subject to such conditions and limitations as the General Assembly may prescribe.

Pa. Const. art. VIII, § 15.

16. Specifically, section 2 of the Project 70 Act states:

It is hereby determined and declared as a matter of legislative finding that:

(1) Fundamental to the welfare of the people of Pennsylvania are the soil and water resources of the State.

(2) Private development of public and private lands for recreational purposes should be encouraged.

(3) The provision of lands for public recreation and the conservation of natural and historical resources promotes the public health, prosperity and general welfare.

(4) The rapid growth of population in Pennsylvania's urban and suburban areas requires the acquisition of lands for recreation, conservation and historical purposes before such lands are lost forever to urban development or become prohibitively expensive.

(5) The Commonwealth of Pennsylvania must act to acquire and to assist local governments to acquire lands that are available and appropriate for such purposes so that they and the lands previously dedicated to recreation, conservation and historical use may be so preserved.

(6) The acquisition of such lands by the Commonwealth is necessary in those counties where public ownership of land for recreation purposes is less than ten per cent of the total land area or where there is an urban area of more than twenty-five thousand persons.

(7) The Commonwealth of Pennsylvania should utilize available Federal programs in order to augment the funds made available under the provisions of this act.

(8) It is the sense of this legislation that acquisition hereunder shall cause a minimum of hardship to the industry and economy of the Commonwealth of Pennsylvania.

(9) Exploration for, development, storage and transportation of oil and gas, when properly conducted, are fully compatible with uses of publicly owned land for recreation, conservation and historical purposes. 72 P.S. § 3946.2. Consistent with the constitutional authority discussed above, section 4(b) of the Project 70 Act provides that "the Governor, Auditor General and State Treasurer are hereby authorized and directed to borrow, from time to time, on the credit of the Commonwealth and subject to the conditions and limitations of this act, money not exceeding in the aggregate the sum of seventy million dollars ($70,000,000), as may be found necessary to carry out the purposes of the aforesaid amendment, and statutes passed in conformity therewith." 72 P.S. § 3946.4(b). Additionally, section 17(d) provides that political subdivisions may acquire land for such purposes "[b]y purchase agreement or by eminent domain proceedings in the manner provided by· applicable provisions of law which may govern land acquisitions for such purposes by such political subdivision...." 72 P.S. § 3946.17(d).

17. Specifically, sections 20(b) and (c) provide as follows:

(b) No lands acquired with funds made available under this act shall be disposed of or used for purposes other than those prescribed in this act without the express approval of the General Assembly: Provided, That ... a political subdivision, as owner of such lands, may issue permits, licenses or leases for the exploration, development, storage and removal of oil, gas or other minerals, or for the installation and use of water, gas, electric, telephone, telegraph, oil or oil products lines, under reasonable regulations prescribed by such owner consistent with the primary use of such lands for "recreation, conservation and historical purposes."

(c) The deeds of all lands acquired under the provisions of this act shall contain the following clause:

essentially requires its own dedication for the limited purposes discussed above and provides a distinct method by which this dedication and/or deed restriction may be removed.

In accordance with section 20(b) of the Project 70 Act, the Borough obtained releases of the Northern Parcels in 1999 and 2012. As noted above, the 1999 release removed the deed restriction with respect to UPI No. 11–4–13 and the 2012 release removed the deed restriction with respect to UPI No. 40–1–23.1. The 2012 release further authorized the sale of this parcel and directed how the proceeds of the sale should be deposited. This Court previously concluded, in our 2012 remand decision, that neither the public trust doctrine nor the DDPA precluded the sale of UPI No. 11–4–13 given the 1999 release.[18] We likewise conclude that the DDPA does not preclude the sale of UPI No. 40–1–23.1 given the 2012 release.[19] The releases by the General Assembly essentially voided the dedication required under the Project 70 Act and permit the conveyance of these parcels. To hold that these parcels are also subject to the disposition requirements of the DDPA would render section 20 of the Project 70 Act a nullity.

Further, such a result comports with the elements of statutory construction. It is a fundamental tenet of statutory construction that "[s]tatutes or parts of statutes are *in pari materia* when they relate to the same persons or things or to the same class of persons or things," and "[s]tatutes *in pari materia* shall be construed together, if possible, as one statute." Section 1932 of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa. C.S. § 1932. However, if the statutes cannot be construed together, then section 1933 of the Statutory Construction Act, 1 Pa.C.S. § 1933, provides that the more specific statute prevails. In this case, the Project 70 Act was enacted subsequent to the DDPA and applied to a very specific type of property, i.e., property purchased with Project 70 Act funds. Hence, the provisions of the Project 70 Act must control the disposition of these parcels.

Moreover, we note that Objectors' reliance on *White v. Township of Upper St. Clair*, 799 A.2d 188 (Pa.Cmwlth.2002), *appeal denied*, (Pa., Nos. 410 and 411 WAL 2002, filed May 11, 2004), in support of its argument that the DDPA applies to land purchased with Project 70 Act funds is misplaced. *White* did not involve the purchase of land with Project 70 Act funds or, consequently, a release by the General Assembly under that Act. Rather, in *White*, the Township of Upper St. Clair acquired

---

This indenture is given to provide land for recreation, conservation and historical purposes, as said purposes are defined in [the Project 70 Act].

72 P.S. § 3946.20(b), (c).

**18.** Specifically, we held that "the public trust doctrine does not preclude the sale of parcel UPI 11–4–13 to Developers because, although this parcel was purchased with Act 70 funds, the General Assembly's subsequent enactment of Act 29 of 1999 permitted its conveyance." *Borough of Downingtown*, 55 A.3d at 173. Further, we held that "[b]ecause the DDPA incorporates the 'salient common-law principles' of the public trust doctrine, the DDPA likewise may not prohibit the sale of this

parcel because the General Assembly, through Act 29 of 1999, specifically authorized its conveyance to Developers." *Id.* (citation omitted.)

**19.** As noted above, while a portion of this parcel would be conveyed to Developers, the remainder would be retained by the Borough as public parkland. Indeed, the 2012 release required the Borough to maintain at least twenty acres of public parkland. This requirement of maintaining public parkland constitutes a reaffirmation that such portion of UPI No. 40–1–23.1 remains dedicated for that public purpose, and, hence, falls within the purview of the DDPA.

land for a public park from the County of Allegheny under a deed that limited the use of the property to recreation, conservation, and historic purposes, *as those terms are defined* under the Project 70 Act.[20] In other words, the parcels in *White* were not acquired with Project 70 Act funds, but rather the use of the parcels for recreation, conservation, and historic purposes was to be similar to the use of those terms as defined in the Act. Accordingly, while the deed limited use of the parcels to purposes akin to those of the Project 70 Act, the Project 70 Act was not directly applicable nor did it govern the use of the property because the property was not acquired with Act 70 funds. While the parcels at issue in this case were similarly dedicated to a public park use, unlike the land in *White*, the parcels herein were actually acquired with Project 70 Act funds. When applied, the Project 70 Act contains specific provisions whereby the General Assembly has authorized a political subdivision to dispose of lands acquired with such funds. The Borough complied with these provisions and obtained the ap-

propriate releases under the Project 70 Act. As noted above, these releases essentially voided the public dedication of these parcels, rendering *White* distinguishable. Thus, the trial court did not err as a matter of law in concluding that the DDPA did not apply in light of the General Assembly's releases of the Northern Parcels from the Project 70 Act restrictions.

## Standing

■ The trial court determined that Objectors lacked standing to contest the conveyance of these parcels. We disagree. Section 20(e) of the Project 70 Act provides that "[t]he Commonwealth of Pennsylvania may specifically enforce the provisions of this requirement by application to a court of equity or may invoke other remedies deemed appropriate under the circumstances." 72 P.S. § 3946.20(e). We have interpreted this provision to mean that only the Commonwealth, and not private citizens, has the authority to enforce the restrictions relating to the use of parcels purchased with Project 70 Act funds.

20. In *White*, the Township of Upper St. Clair negotiated a lease with Crown Communications for a portion of the public park upon which it would construct a communications tower. This tower would be 350 feet high and replace an existing 180–foot communications tower which was built in 1992 and provided the Township of Upper St. Clair with certain emergency communications support. The lease included .428 acres of the approximately 200 acres that make up the public park. As part of its lease, Crown Communications agreed to provide the Township of Upper St. Clair with an upgraded public communications system for 911, police, fire, and emergency medical services, and to pay an annual rent of $2,500.00.

Subsequent to the construction of the tower, several local residents filed a complaint with the common pleas court seeking declaratory and injunctive relief to have the lease declared null and void and the tower removed. The Township of Upper St. Clair and Crown Communications filed preliminary ob-

jections alleging that residents lacked standing, that residents failed to state a cause of action, and that the common pleas court lacked subject matter jurisdiction. The common pleas court sustained the preliminary objections and dismissed the complaint. The common pleas court concluded, *inter alia*, that the residents lacked standing. On appeal, this Court reversed, holding that the residents had standing to pursue a claim that the Township failed to uphold the terms of the dedication of the public park. In so holding, we noted that a political subdivision's obligation to uphold a public dedication is "absolute, not discretionary," and that it "lacks authority to assent to the use of public land for any purpose even a public purpose other than the intended purpose." *Id.* at 195. We recognized in *White* that "[t]he standing analysis is different in cases where citizens seek to protect a park, a town square or other land dedicated to a particular public purpose from degradation or intrusion by an inconsistent public or private use." *Id.* at 193.

*Feldman; White.* In *White,* we discussed section 3 of the DDPA, which requires a political subdivision holding lands as a trustee to use such lands for the purpose or purposes for which the land was dedicated unless the purpose is modified by court order.

We noted that the DDPA did not specify what persons may enforce the political subdivision's duty in this regard and ultimately held that residents of the Township of Upper St. Clair had standing to enforce this duty. However, we noted that section 20(e) of the Project 70 Act identified the Commonwealth as the only party that may enforce the duties under that Act and that we had interpreted section 20(e) as precluding private persons from initiating proceedings under that Act. Significantly, this case is not about enforcement of the Project 70 Act restrictions. The General Assembly has released the Northern Parcels from these restrictions and Objectors are challenging the conveyance of these parcels subsequent to their release. Hence, our reasoning in *White* supports a finding of standing herein, as does this Court's opinion in *Pilchesky v. Redevelopment Authority of the City of Scranton,* 941 A.2d 762 (Pa.Cmwlth.2008).

In *Pilchesky,* this Court reversed a common pleas court's grant of preliminary objections of the Redevelopment Authority of the City of Scranton (Authority) in the nature of a demurrer on the basis that Joseph Pilchesky lacked standing. Pilchesky had filed a complaint in the nature of a declaratory judgment action against the Authority alleging that the transfer of the South Side Sports Complex (Complex) to the University of Scranton was illegal. This Complex had been developed with Project 70 Act funds and had been accepted and dedicated to sports and recreation for public use in 1977. In July 2003, the Authority and the University reached a memorandum of understanding on the terms of the sale of the Complex. In December 2003, the General Assembly formally removed the Project 70 Act restrictions. Despite this release, Pilchesky alleged in his complaint that the sale of the Complex was still subject to the public trust doctrine. The trial court concluded that Pilchesky lacked standing based on his status as a taxpayer and dismissed the complaint.

On appeal, this Court reversed, concluding that Pilchesky had standing as a resident and taxpayer to pursue the claim that the sale of the Complex was inconsistent with the terms of its dedication to public use. We rejected the common pleas court's finding that Pilchesky failed to meet the first requirement for achieving taxpayer status, i.e., that the governmental action would otherwise go unchallenged. While a prior action had challenged the sale of the Complex, we noted that the prior action did not involve an issue of standing or the public trust doctrine. Rather, the prior action involved an alleged violation of the DDPA, the Authority's purported lack of power to sell or convey the Complex, and the Authority's purported failure to follow its own procedures for such a sale. Furthermore, we noted that "the standing analysis is different in cases where citizens seek to protect a park, a town square or other land dedicated to a particular public purpose from degradation or intrusion by an inconsistent public or private use." *Id.* at 765 (citing *White,* 799 A.2d at 193). This same reasoning can be applied herein. Here, the Northern Parcels were purchased with Project 70 Act funds and were dedicated to, and continue to this day to serve, a public park use. Like Pilchesky, Objectors are residents and taxpayers seeking to pursue a claim that the sale of the Northern Parcels is inconsistent with the terms of the parcels' dedication to public

use. Thus, the trial court erred in concluding that Objectors lacked standing to contest the conveyance of the Northern Parcels.

Additionally, Objectors specifically assert standing under the private attorney general's doctrine. Standing is conferred under this doctrine "where one party who may not carry a substantial, direct or immediate interest in the subject matter of the litigation ... shares a common interest with citizens or taxpayers in general ... and the only challenge to the action in question would derive from that taxpayer's intervention." *Society Created to Reduce Urban Blight (SCRUB) v. Zoning Board of Adjustment of the City of Philadelphia,* 729 A.2d 117, 121 n. 13 (Pa.Cmwlth.1999) (citations omitted). Objectors allege that the Attorney General has "done nothing during these proceedings." (Brief of Objectors at 28.)

While the record reflects limited participation by counsel for the Office of Attorney General (OAG) (i.e., counsel was present during the hearings and conferences, submitted briefs on the issues, and cross-examined witnesses during the 2009 hearings), as the OAG notes in its brief, it quickly determined that "active participation" in this case "was not essential" given the fact that "both sides were well represented and could be counted on to develop a complete record and raise all relevant factual and legal issues" before the trial court. (OAG Brief at 18.) Thus, the OAG chose not to present any evidence given the depth of legal representation in this case. In so doing, it essentially conferred standing on Objectors.[21]

In any event, neither the Borough nor Developers raised any objection to Objectors' standing during the course of the proceedings before the trial court. Rather, Objectors fully presented their case, including witnesses and evidence, and actively participated in the cross-examination of the witnesses presented on behalf of the Borough and Developers. The trial court merely addressed the issue of standing as an alternative issue and in an effort to avoid any further remand proceedings in the event that we disagreed with its statutory analysis. Nevertheless, in light of the above, the trial court erred in concluding that Objectors lacked standing to contest the conveyance of the Northern Parcels.

## The Easements—Meisel Parcel and Northern Parcel UPI No. 40–1–23.1

■ Objectors also argue that the trial court erred as a matter of law in concluding that the Borough did not need Orphan's Court approval of the proposed easements for utility, storm water and open space requirement needed for an off-site residential development because a grant of those easements did not constitute a sale or change in the use of the property and was not inconsistent with the use of the relevant parcels as parkland.

Section 3 of the DDPA, 53 P.S. § 3383, provides "[a]ll such lands and buildings held by a political subdivision, as trustee, shall be used for the purpose or purposes for which they were originally dedicated or donated...." After considering all of the evidence, the trial court found that none of the easements would impede the public's use of the property as parkland, including

---

**21.** In its brief, the Commonwealth agrees with the trial court that Objectors lack statutory standing under the Project 70 Act, but would concede that Objector Feldman would be able to assert common-law standing in that she would be aggrieved inasmuch as she resides in the Borough immediately adjacent to one of the parcels at issue and stands to be directly affected by the proposed sale and development of Kardon Park.

the storm water easements, findings that are amply supported by the record.

Neither the utility or storm water easements in any way impede with the use of Kardon Park because the construction easements are temporary; the maintenance easements allow access and are not intrusive; and the utility easements are underground. As to the storm water easements, those easements may well require changes in Kardon Park, but none of those changes are inconsistent with the use of the property as a park. While there may be a reduced shoreline at the Fourth Lake, there are new vegetative wetlands that serve a park purpose; while part of the Lions Trail will be relocated, there will still be a trail; and while there will be new parking areas, they will allow individuals to access Kardon Park. Nothing requires that the property be used in the way Objectors believe Kardon Park should be used, just that it be used as a park.

As to the use of portion of parkland to satisfy an open space requirement, while that may be problematic in the land use sense, the matter before us is whether the use of the open space will substantially impede the public's use of the property as a park in violation of the DDPA. There is nothing to indicate that allowing Developer to use the property to satisfy the open space requirement for the adjoining residential development will have any impact whatsoever on the park use.

Because the grant of the easements does not interfere with the public use of the land as parkland, we also affirm the trial court as to this issue.

### Conclusion

Accordingly, because the Southern Parcels continue to be used as public parkland, we affirm the trial court's order insofar as it held that the DDPA, rather than section 310(a) of the Code, controls the Borough's disposition of these parcels. Additionally, given the General Assembly's releases of the Northern Parcels from the Project 70 Act restrictions, we affirm the trial court's order holding that the DDPA did not apply to the Borough's disposition of these parcels. However, given our prior opinions in *White* and *Pilchesky*, we reverse the trial court's order insofar as it held that Objectors lacked standing to contest the conveyance of the Northern Parcels. Further, because the grant of the easements does not interfere will the public use of the land as park land, we affirm the trial court's order holding that the DDPA was not implicated, and Orphans' Court approval was not required, for the grant of the easements related to the Meisel parcel and a portion of parcel UPI No. 40–1–23.1.

Judge BERNARD L. McGINLEY dissents.

Judge BONNIE BRIGANCE LEADBETTER did not participate in this decision.

### *ORDER*

AND NOW, this 29th day of April, 2015, the December 20, 2013, order of the Court of Common Pleas of Chester County (trial court), insofar as it relates to the Northern Parcels, the Southern Parcels, and the easements on the Meisel parcel and UPI No. 40–1–23.1, is affirmed. The order of the trial court, insofar as it denies Kim Manufacturing Company, Stewart Hall, L.P., Friends of Kardon Park, and Ann Feldman standing to contest the conveyance of the Northern Parcels, is reversed.

CONCURRING AND DISSENTING OPINION BY Judge ROBERT SIMPSON.

I join Majority disposition regarding the Northern Parcels and regarding proposed easements on the Meisel Parcel and Northern Parcel UPI No. 40–1–23.1. How-

744

ever, I respectfully dissent from both opinions as to the Southern Parcels, acquired by condemnation.

The practical issue regarding the Southern Parcels is whether the Borough of Downingtown can sell the Parcels under Section 310(a) of the Eminent Domain Code, 26 Pa.C.S. § 310(a), or whether the orphan's court must approve the sale under the Donated or Dedicated Property Act (DDPA).[1] The former allows transfer of previously condemned property held for more than 21 years where the condemnor abandons the purpose for which the property was condemned. Under this provision of the Eminent Domain Code, the condemnor is the decision maker. In contrast, the DDPA confers jurisdiction on the orphan's court to approve the sale of property held in trust when it determines that the original use is no longer practicable or possible. *See* Section 4 of the DDPA, 53 P.S. § 3384. The orphan's court has the controlling discretion, not the municipality. *In re Erie Golf Course*, 605 Pa. 484, 992 A.2d 75 (2010).

The question of who should be the decision maker here would seem to be easily answered. This is because Section 6 of the DDPA, 53 P.S. § 3386, provides (with emphasis added): *"Nothing in this act shall be construed to limit or effect the control by a political subdivision of public lands or buildings acquired by such political subdivision by purchase or condemnation."* If this clear language is given effect, the condemning municipality will be the decision maker.

The same conclusion is reached by applying an analytical process the Supreme Court uses to determine which entity the legislature intended to have preeminent powers over a given area of regulation. This process was originally set forth in

*Commonwealth v. Ogontz Area Neighbors Association*, 505 Pa. 614, 483 A.2d 448 (1984), and the process was recently applied again by the Court in *Southeastern Pennsylvania Transportation Authority v. City of Philadelphia*, —— Pa. ——, 101 A.3d 79 (2014). "The first step requires the reviewing court to determine, through the examination of the statutes, which governmental entity, if any, the General Assembly expressly intended to be preeminent." *Ogontz*, 483 A.2d at 455.

Here, based on the language of Section 6 of the DDPA, the General Assembly expressed that the political subdivision owning lands acquired by condemnation should prevail over the decision maker under the DDPA. Thus, consistent with the Supreme Court's line of cases starting with *Ogontz*, the condemning municipality under the Eminent Domain Code should be the decision maker in the first instance for property acquired by condemnation.

The trial court, however, disregarded the quoted language of Section 6 of the DDPA. Relying on the Supreme Court's decision in *Erie Golf Course*, the trial court effectively held that Section 6 of the DDPA is not operative. This was error.

The Court in *Erie Golf Course* examined the DDPA. The Court noted that there was ambiguity as to the term "purchase" as used in Section 6 of the DDPA. *Erie Golf Course*, 992 A.2d at 86. The Court also noted a conflict between the apparent intent of Section 6 to protect the rights a municipality may have acquired in connection with a purchase, and some aspects of the pre-existing common law which could be more restrictive of municipal discretion than the DDPA. *Id.* at 86 n. 15. In other words, if the DDPA did not apply to property acquired by purchase, such property would be subject to inflexible rules of the

1. Act of December 15, 1959, P.L. 1772, *as* amended, 53 P.S. §§ 3381–3386.

common law. That outcome was contrary to the apparent purpose of Section 6 to protect a municipality's interest in property acquired by purchase. The Court therefore concluded that Section 6 redressed "a concern for the preservation of such rights and interests as a political subdivision may have acquired in connection with a purchase." *Id.* at 88. However, the Court did not believe that Section 6 "was intended to remove entirely from the [DDPA's] purview (and thus maintain inflexible irrevocability relative to) any and all trust property that may in any sense of the word be said to have been purchased." *Id.*

Thus, the Supreme Court in *Erie Golf Course* modified the application of Section 6 to purchased property in an effort to protect a municipality's discretion. The Court did not discuss property acquired by condemnation.

The trial court here expanded the Supreme Court's *Erie Golf Course* holding to also modify the application of Section 6 to property acquired by condemnation. It did so, however not to *protect* the municipality's discretion; instead, the trial court sought to *limit* the municipality's discretion. I see nothing in the Supreme Court's discussion of Section 6 of the DDPA which would support such an outcome.

There are other reasons why the holding in *Erie Golf Course* does not compel the result reached by the trial court. First, unlike property acquired by "purchase," there is no ambiguity about what property is acquired by condemnation. Also, there is no conflict between the apparent intent of Section 6 to protect a municipality's rights in property acquired by condemnation and a municipality's rights to dispose

of such property in accordance with Section 310(a) of the Eminent Domain Code.

For all these reasons, I would apply Section 6 of the DDPA as written to property acquired by condemnation. Thus, I would conclude that the DDPA does not apply to such property and that the Borough may dispose of the Southern Parcels acquired by condemnation if it proves that Section 310(a) of the Eminent Domain Code applies.

As alternative findings, the trial court specifically determined that: (a) the Borough owned the Southern Parcels for more than 21 years; and (b) the Borough abandoned the purpose of parkland use of the condemned parcels. Tr. Ct. Slip Op. at 7–8. Given these findings, I would hold that the Borough may dispose of the Southern Parcels pursuant to Section 310(a) of the Eminent Domain Code without approval of the orphan's court. Thus, I would reverse the respected trial court on this issue.

Judge BERNARD L. McGINLEY joins in this concurring and dissenting opinion.

Concurring and Dissenting OPINION
BY Judge PATRICIA A. McCULLOUGH.

I join the Majority opinion insofar as it affirms the decision of the Court of Common Pleas of Chester County, Orphans' Court Division (trial court), concluding that the Donated or Dedicated Property Act (DDPA)[1] controls the disposition of the Southern Parcels by the Borough of Downingtown (Borough) and that the DDPA did not apply to the Borough's disposition of the Northern Parcels given the General Assembly's releases of the same from the restrictions imposed by the Project 70 Land Acquisition and Borrowing Act (Project 70 Act).[2] I likewise join the

1. Act of December 15, 1959, P.L. 1772, *as amended*, 53 P.S. §§ 3381–3386.

2. Act of June 22, 1964, Special Sess., P.L. 131, *as amended*, 72 P.S. §§ 3946.1–3946.22.

Majority opinion insofar as it reverses the trial court's decision concluding that Kim Manufacturing Company, Stewart Hall, L.P., Friends of Kardon Park, and Ann Feldman (together, Objectors) lacked standing to contest the conveyance of the Northern Parcels.

However, I respectfully dissent to the Majority's opinion insofar as it affirms the trial court's decision concluding that the Borough was not required to obtain Orphans' Court approval for the grant of the proposed easements to Progressive Housing Ventures, LLC and J. Loew & Associates, Inc. (together, Developers). Here, Developers sought various construction, maintenance, and utility easements as well as a permanent easement to discharge stormwater into an existing man-made pond on UPI No. 40–1–23.1, one of the two Northern Parcels, known as Fourth Lake. Developers needed these easements to satisfy the open space and stormwater management requirements of the Township's zoning ordinance. The trial court found that Orphans' Court approval was not required for these proposed easements and the DDPA was not implicated because the grant of these easements did not constitute a sale or change in the use of the property. The Majority agrees with the trial court, concluding that the grant of the easements would not interfere with the public use of the land as parkland. I respectfully disagree.

While the Majority accepts the assertion by the Borough and Developers that portions of Kardon Park will continue to be used as public parkland, I believe this assertion is a red herring. It conflicts with this Court's precedent that a township's obligation to uphold a dedication is absolute, not discretionary. *See White v. Township of Upper St. Clair*, 799 A.2d 188 (Pa.Cmwlth.2002), *appeal denied*, (Pa., Nos. 410 and 411 WAL 2002, filed May 11, 2004). Dedication of land for public use as a park is just that. It does not encompass any intention that there be use of the land for private inurement of a developer. Along these lines, I also disagree with the Majority's characterization of the use of a portion of parkland to satisfy an open space requirement as merely problematic in the land use sense. The present matter is not merely problematic in the land use sense, it runs directly afoul of our prior holdings in *White* and *White v. Township of Upper St. Clair*, 968 A.2d 806 (Pa. Cmwlth.2009) (*White II*), establishing a duty on the part of a municipality under the DDPA to adhere to the dedication of certain land for public use.

Section 3 of the DDPA requires that "[a]ll such lands and buildings held by a political subdivision, as trustee, shall be used for the purpose or purposes for which they were originally dedicated or donated, except insofar as modified by court order pursuant to this act." 53 P.S. § 3383. Additionally, in *White*, we held that, "under Pennsylvania law, **the [t]ownship's obligation to uphold the [public] dedication is absolute, not discretionary. A political subdivision lacks authority to assent to the use of public land for any purpose even a public purpose other than the intended purpose, no matter how exigent the circumstances.**" *Id.* at 195 (emphasis added). We relied on our Supreme Court's holding in *Hoffman v. City of Pittsburgh*, 365 Pa. 386, 75 A.2d 649, 651 (1950), that:

> The applicable principle of law is well stated in 3 Dillon, Municipal Corporations, 5th Ed., Sec. 1102: 'A **municipal corporation has no implied or incidental authority to alien, or to dispose of for its own benefit, property dedicated to or held by in trust for the public use** or to extinguish the public uses in such property, nor is such property ...

or the proceeds of sale thereof available for the payment of the debts of the municipality.'.

This has been the law of Pennsylvania for over a century.[3]

(Footnotes and citations omitted) (Emphasis added).

We further stated in *White* that "[n]ot only is the sale of dedicated public land prohibited, so is the lease of dedicated public land. A municipality has been found to lack authority to lease dedicated public property to private concerns where the lease would be inconsistent with the terms of the dedication." 799 A.2d at 195. *White* involved a township's lease of .428 acres of a 200–acre public park for construction of a communications tower, and, unlike the present case, there was very little discussion in *White* regarding the impact that the tower would have on the public's use of the land as a park. We found that the residents had standing under the DDPA to challenge the township's lease of even a small portion of dedicated, public land and that the township had recourse under section 4 of the DDPA by applying "to orphans' court for approval to apply the property to a different public purpose." *Id.* However, without such approval, "the [t]ownship was obligated to ensure that the use of the .428 acres of Boyce Park at issue ... was consistent with a recreation, conservation or historical purpose." *Id.*

Similarly, in this case, the Borough has an obligation to uphold the dedication of Kardon Park as public parkland and is precluded from assenting to the use of Kardon Park for ·any other purpose,

whether it be in the form of a sale, a lease, or the grant of an easement for the benefit of a private developer. Each of the aforementioned actions results in the alienation, disposal, or encumbering of property dedicated to public use and/or held in trust by the Borough for public use, and is specifically prohibited by *Hoffman* and *White*. Nevertheless, similar to the township in *White*, the Borough is not without recourse. The Borough could seek Orphans' Court approval under section 4 of the DDPA to "to apply the property to a different public purpose." *Id.* at 195.

While the legislature may delegate broad powers to a municipality to permit and control reasonable encroachments upon public lands, such as sidewalks, "[s]uch authority must be by legislative grant in clear words or by unavoidable implication." *46 South 52nd Street Corporation v. Manlin*, 398 Pa. 304, 157 A.2d 381, 388 (1960). Here, the legislature, through the enactment of the DDPA, has imposed strict limitations with respect to a municipality's use and disposition of dedicated property.

Although it appears that the proposed easements will result in significant alterations to Kardon Park, including: increased runoff from stormwater discharge into the Fourth Lake, which sits above and is connected to the other lakes in the park; the elimination of shore line; the creation of new vegetative wetlands; the relocation of at least part of the Lions Trail; and new parking areas, (R.R. at 2683a–86a, 2707a–09a, 2745a–49a, 2794a, 2803a),[4] our review does not end here because the easements at issue in this case would also allow De-

---

3. This principle is known as "Dillon's Rule."

4. While the trial court relied on the testimony of Dennis Glackin, a licensed professional land planner, and Victor Kelly, a licensed professional engineer, presented by the Borough and Developers to establish that the easements will not alter the use of these par-

cels as parkland, this testimony focused almost exclusively upon the discharge of stormwater into the Second, Third, and Fourth Lakes, and did not address how the construction, maintenance, and utility easements, or the use of these easements to satisfy the open space requirements of the Township's zoning

velopers to utilize portions of Kardon Park to meet utility, stormwater, and perhaps most importantly, open space requirements in the Township's zoning ordinance. Indeed, in their original joint petition seeking a declaration that no Orphans' Court approval was required for the easements, the Borough and Developers state that all of UPI No. 40–1–23.1, one of the Northern Parcels, and that portion of the Meisel parcel located in the Township, will be "included in the calculation of open space required under the Township Zoning Ordinance for the Development." (R.R. at 2526a.) Neither the Borough nor Developers have set forth any case law or advanced any public policy which would favor a private developer's use of public land to satisfy the requirements of a local ordinance. The easements at issue solely benefit Developers, which need these easements in order to proceed with their proposed development.[5]

Accordingly, I would reverse the trial court insofar as the Township's obligation

ordinance, will affect the public use of these parcels.

5. While this Court has clearly established the DDPA's disallowance of conveying dedicated public parkland in this manner, our Supreme Court's recent decision in *Reading Area Water Authority v. The Schuylkill River Greenway Association*, —— Pa. ——, 100 A.3d 572 (2014), is also instructive. The primary issue in that case concerned whether a municipal authority may exercise its eminent domain power to condemn an easement over privately-owned land where the sole purpose of the easement was to supply a private developer with land to install sewer drainage facilities necessary for a proposed private residential subdivision.

After failed negotiations regarding the purchase of an easement, the Reading Area Water Authority (RAWA) adopted a resolution in February 2009 authorizing the use of eminent domain to condemn a utility easement across property owned by the Schuylkill River Greenway Association (Association). The resolution reflected that the easement was to be condemned at the request of a private developer and that it would be used to connect the developer's proposed residential subdivision to water, sewer, and stormwater facilities. Additionally, the resolution stated that the developer would be required to pay all costs associated with the eminent domain proceedings, including just compensation for the Association.

RAWA subsequently filed a complaint in the nature of a declaration of taking with the common pleas court requesting a decree condemning a 50–foot wide easement across the Association's property. The Association filed preliminary objections asserting that the taking was invalid under the Property Rights Protection Act (PRPA), 26 Pa.C.S. §§ 201–207. Section 204(a) of the PRPA provides that "the exercise by any condemnor of the power of eminent domain to take private property in order to use it for private enterprise is prohibited." 26 Pa.C.S. § 204(a). The trial court, citing section 204(a), sustained the Association's preliminary objections and dismissed RAWA's complaint. This Court reversed, concluding that RAWA may exercise eminent domain for the installation of a water main and utility lines. While the availability of these utilities would have made the developer's homes more valuable, we noted that this alone would not negate the project's public purpose of providing water, sewer, and stormwater services to citizens in RAWA's service area.

Our Supreme Court reversed, relying on the prohibition in section 204(a) of the PRPA. The court first observed that the record established that RAWA only sought to exercise its eminent domain power to provide a utility easement to the developer. Indeed, the court noted that the developer "would not only finance the project, but would acquire exclusive use of the drainage easement to install, operate, and maintain private stormwater and sewer discharge facilities so as to enable it to build a private residential development." *Reading Area Water Authority*, 100 A.3d at 580. The court next described the broad prohibition in section 204(a), which precludes the condemnation of property "to use it for **private enterprise.**" 26 Pa.C.S. § 204(a) (emphasis added). The court observed that "[w]hatever public benefit may ensue from the drainage easement, it is being taken to be used for private enterprise and, as such, is prohibited by Section 204(a)." *Reading Area Water Authority*, 100 A.3d at 581 (emphasis added).

to uphold the public dedication is absolute, and, therefore, the Township lacks the authority to grant easements for the private inurement of Developers without first seeking Orphans' Court approval of the easements to "apply the property to a different public purpose." Section 4 of the DDPA, 53 P.S. § 3384.

Here, although the particular parcels over which the easements would run were not acquired by eminent domain, as in *RAWA*, these parcels comprise only part of Kardon Park, the entirety of which was dedicated to public parkland use. At least two of the parcels comprising Kardon Park, the Southern Parcels, were acquired by the Borough via the use of its eminent domain power, portions of which the Borough now seeks to convey to Developers. Hence, the present case does involve, in the overall scheme, the Borough's use of its eminent domain power to take private property exclusively for private enterprise. Even though the condemnation of the Southern Parcels in this case did not occur contemporaneously with the granting of easements as in *RAWA*, the condemnation and subsequent dedication could be viewed as an attempt to circumvent the prohibition against condemnation for a private use under section 204(a) of the PRPA.

The easements proposed by the Borough were for the exclusive use of Developers and were necessary for Developers' proposed residential development to meet the stormwater and open space requirements of the Township's zoning ordinance. These proposed easements impact property which has been used for the past four decades, and continues to be used today, as a public park. The granting of the proposed easements would create new precedent allowing a private developer to utilize public property to meet the requirements of a zoning ordinance. Such precedent may serve to discourage the donation of property from private individuals or organizations for a public purpose. Hence, I believe the reasoning underlying our Supreme Court's decision in *Reading Area Water Authority*, i.e., precluding a municipality's grant of an easement via condemnation for the benefit of a private developer and necessary for the construction of a private residential development, is equally applicable here.